### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **KAREN DAVIS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:21-cv-00233-SLC** |
| | ) | |
| **CITY OF FORT WAYNE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### OPINION AND ORDER

Plaintiff Karen Davis filed this lawsuit against her former employer, Defendant City of Fort Wayne ("the City"), on June 8, 2021, alleging interference and retaliation under the Family and Medical Leave Act of 1993 ("FMLA"), age discrimination under the Age Discrimination in Employment Act of 1967 ("ADEA"), and gender and race discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"). (ECF 4; ECF 18).[1]

On November 14, 2022, the City filed a motion for summary judgment (ECF 23), together with a supporting brief and evidence (ECF 24). On December 2, 2022, Davis sought an extension to file her response to the motion (ECF 25), which the Court granted (ECF 26). Davis moved the Court for an extension of time to file her response for the second time on January 16, 2023, explaining that a key witness, Lyndsey Ankney, withdrew her testimony just prior to the response deadline (ECF 27). On January 17, 2023, the City filed a response in objection to the motion for an extension of time (ECF 28), and Davis timely filed a reply (ECF 29) and an accompanying affidavit (ECF 30) that same day. Also on January 17, 2023, Davis filed a

---

[1] Subject matter jurisdiction under 28 U.S.C. § 1331 is proper in this Court. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (ECF 15).

response to the City's motion for summary judgment (ECF 31), and supporting evidence (ECF 32), stating that the response brief was filed "without the designated testimony of Lyndsey Richards-Ankney" (ECF 31 at 1 n. 1).

On January 19, 2023, the Court set a hearing on Davis's second motion for an extension for January 24, 2023. (ECF 33). During the January 24, 2023, hearing, the Court granted Davis's motion for an extension and allowed her to depose Ankney by February 24, 2023. (ECF 34). The Court also directed Davis to file a revised response to the City's motion for summary judgment by February 28, 2023, and set a telephonic status conference for February 23, 2023. (*Id.*). During the February 23, 2023, hearing, the parties confirmed that no additional discovery was warranted, and the Court set the City's reply brief deadline to March 2, 2023. (ECF 38).

On February 6, 2023, Davis filed her supplemental response to the motion for summary judgment and supporting evidence, which included Ankney's deposition evidence. (ECF 35, 36). The City filed a reply to Davis's supplemental response on March 2, 2023 (ECF 39), a reply to Davis's additional material facts (ECF 40), and a supplement to its memorandum in support of its motion for summary judgment (ECF 41). Thus, the motion is ripe for ruling. For the following reasons, the City's summary judgment motion will be GRANTED as to the FMLA retaliation claim and DENIED as to the Title VII race discrimination claim. Additionally, the City's summary judgment will be GRANTED as to Davis's FMLA interference, ADEA, and Title VII gender discrimination claims because she concedes those three claims.

# I. FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. Davis Joins the ROW Department

Davis, a black woman, began working for the City as a Public Information Officer at the Mayor's Office in May 2011. (ECF 40 ¶¶ 42-43). In January 2014 through November 2017, she joined the City's Public Works Department as a Public Outreach Coordinator. (*Id.* ¶ 44). During her time at the Mayor's Office and at the Public Works Department, Davis had no disciplinary issues. (*Id.* ¶¶ 45-46).

She ultimately transitioned to the Right of Way Department ("ROW" or "Department"), a division within the City's Public Works Department, under the supervision of Nick Jarrell, manager of ROW. (ECF 35 ¶ 2). ROW is responsible for issuing permits to conduct work or host events on City streets or sidewalks. (*Id.*). As such, employees of the Department must process permits and payments in a timely fashion to ensure that the stakeholders are not affected negatively if work or events that have been planned ahead of time are not approved. (*Id.*).

### B. Change of Policies in Response to COVID-19

On November 20, 2020, in response to the COVID-19 pandemic and the associated closure of the building housing the Department, Jarrell emailed ROW employees, informing them of a new hybrid work policy. (*Id.* ¶¶ 2-4, 8; *see* ECF 24-8 at 20-21). The new policy was applicable to Ankney, Davis, and Karen Butler, all of whom were employees at the Department. (ECF 40 ¶ 53).

Specifically, Jarrell directed Davis and her coworker Butler to work in the office a "minimum [of] two days a week" and opposite of each other, informed that phones "will be

---

[2] For summary judgment purposes, the facts are recited in the light most favorable to Davis, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

forwarded with interaction client on," tasked Butler to make the permit list "beginning of each day for both to work off of," and tasked Davis to complete neighborhood project letters, if any. (ECF 24-8 at 21). The email also directed Butler and Davis to account for all receipts of permit payments (a process called "deposit" or "cash receipts") during office-days before 10am and pick up the mail after deposits were made (ECF 35 ¶¶ 5-6; *see* ECF 24-8 at 21), because the cash receipts could not be handled at home as they had to be deposited by the City Controller's Office (ECF 35 ¶¶ 6-8).[3]

In his email, Jarrell also indicated that "[t]here will not be clocking in this time," but directed ROW employees to email him when they would be at the office and leaving, as well as a list of items each employee completed that day. (ECF 40 ¶ 52; *see* ECF 24-8 at 21 (emphasis omitted)). Employees were not required to be in the office for a certain number of hours, as long as they completed the tasks. (ECF 40 ¶ 54; *see* ECF 24-8 at 21). As a result of the new policy, Davis agreed to come into the office on Tuesdays and Thursdays. (ECF 35 ¶¶ 4, 9; *see* ECF 24-8 at 19).[4] When the new policy went into effect, employees would email Jarrell to inform him of the start of the workday, including Davis. (ECF 40 ¶ 55).

*C. Cash Deposit Policy*

ROW continued to receive permit payments during the COVID-19 pandemic, although its office building was closed to the public until January 25, 2021. (ECF 35 ¶¶ 2-3, 8; *see* ECF 24-8 at 20). The City's policy was that cash receipts were to be performed the next business day after receipt of permit payments if they exceeded five-hundred dollars. (ECF 35 ¶ 12; ECF 40 ¶

---

[3] The time the deposits were due is subject to dispute. (*Id.*).

[4] The record reflects that Butler was present on at least one Tuesday (January 12, 2021) and one Thursday (January 14, 2021), suggesting Butler may have been assigned to come into the office on Tuesdays and Thursdays as well. (ECF 24-4 ¶ 7; ECF 24-8 at 22, 30; ECF 35 at 5).

91). That policy was implemented to ensure the Department complied with state law, Indiana Code § 5-13-6-1, which required that a deposit must be completed on the next business day following payment receipts in excess of five-hundred dollars. (ECF 35 ¶ 12); *see* Ind. Code § 5-13-6-1 ("[T]he funds on hand must be deposited not later than the business day following the day that the funds exceed five hundred dollars ($500).").

### D. The December 30, 2020, Performance Evaluation

On December 30, 2020, Jarrell sent Davis a performance evaluation. (ECF 40 ¶ 48). Davis disagreed with the evaluation and requested a meeting with Jarrell to discuss its content. (*Id.*). Davis's objections to the performance evaluation concerned reports of her leaving the office during the workday, issues with the number of permits she completed, and the fact that her job titled was changed from ROW Program Manager to Assistant Permit Coordinator. (*Id.* ¶ 49). On her performance evaluation, Davis received scores ranging from 2.5 to 3.3, with a score of "2" signifying "needs improvement" and "3" signifying "meets expectations." (ECF 18-1). Davis was not told that her job was in jeopardy, and despite her disagreements with her performance evaluation, she believed that she was meeting her employer's expectations. (ECF 40 ¶¶ 50, 51).

### E. On January 12, 2021, Davis Starts to Worry About COVID-19 Protocols, Arrives at Work Around Midday, and Does Not Perform Cash Receipts

In January 2020, Davis began noticing that her coworkers would come into the office outside of their designated days and became concerned about her safety when working in the office. (*Id.* ¶¶ 57-58, 63, 66; *see* ECF 24-8 at 30). She first contacted Jarrell on January 12, 2021, after arriving around midday, indicating that she was no longer comfortable going into the office and asked to come into the office after regular hours to perform in-office tasks. (ECF 40 ¶¶ 57-58; *see* ECF 24-8 at 22, 29-30). In response, Jarrell emailed the City's Human Resource ("HR")

Department, stating that Davis "ha[d] refused to come to the office to fulfill her duties of taking our cash receipts up to the controller's office due to the new strand of Covid-19," that "she would come in after hours" although the cash receipts were "due before noon every day," and asking "[c]an she tell [him] that she can't come in?" (ECF 40 ¶ 59). The City's Director of Risk Management responded that there was no reason not to come into the office as they had "controls in place and [Davis] has been trained on COVID." (ECF 35 ¶ 15; ECF 40 ¶ 60). Jarrell, in turn, communicated this message to Davis, in addition to changing her coworker Butler's assigned day to Mondays and Wednesdays. (ECF 35 ¶ 16; *see* ECF 24-8 at 19). He further reminded Davis that she had to be "in" because he believed her remote work phone was no longer working. (ECF 35 ¶ 16; *see* ECF 24-8 at 19).[5] However, Jarrell failed to communicate a part of the Director of Risk Management's response, which read that "[i]f [Davis] wants the day off then she needs to follow [Jarrell's] protocol on requesting time off," along with the fact that she had paid-time off ("PTO") available she could use. (ECF 40 ¶¶ 60-61). On that day, Davis did not handle the cash receipts as she did not see that the permit payments exceeded five-hundred dollars. (*Id.* ¶ 94). Instead, Butler completed the cash receipts. (*Id.* ¶ 68; *see* ECF 24-8 at 26).

*F. On January 14, 2021, Davis Continues to Express Concerns About COVID-19 Protocols, Arrives by Midday, and Does Not Complete the Cash Receipts*

Davis returned to the office around midday on January 14, 2021, and found "too many [people]" there. (ECF 35 ¶¶ 18, 20; ECF 40 ¶ 64). She informed Jarrell that she would be returning home because she did not feel safe. (ECF 24-8 at 29; ECF 35 ¶ 20). She further stated that Butler had a problem with the cash receipts. (ECF 24-8 at 29; ECF 35 ¶ 20). Jarrell responded that the cash receipts had not been done and that her voicemails still needed to be

---

[5] Again, the issue of whether Davis's in-office phone was working is disputed. (ECF 24 at 9; ECF 36 at 17).

checked from her office, and he asked what the problem was with the cash receipts. (ECF 24-8 at 29; ECF 35 ¶ 22). Davis responded "I have no access to voicemails. Butler is at her desk now. I have no idea what the problem is." (ECF 35 ¶ 23; *see* ECF 24-8 at 29). Jarrell assured Davis that "everything [is] safe" and that "if there's a problem it needs [to be] brought up . . . ." (ECF 35 ¶ 24). In response, Davis indicated that she could access her voicemails, but that they were not coming to her office phone. (ECF 24-8 at 30). She further insisted that there were too many people at the front office, that she was not aware employees who were not assigned that day would be coming in, and generally communicated her concerns about the state of the pandemic. (*Id.*). Jarrell never responded. (*Id.*).

Forty to forty-five minutes after her arrival, Davis left the premises. (ECF 35 ¶ 25). Butler completed the cash receipts around 1:47pm that day. (*Id.* ¶ 19; *see* ECF 24-8 at 29). At this point, Davis was still not under the impression that her job was in jeopardy for her leaving the office. (ECF 40 ¶ 67).

*G. On January 19, 2021, Davis Arrives at the Office Around Midday and Does Not Complete the Cash Receipts*

Davis arrived at the office around midday on January 19, 2021, her next in-office day. (ECF 35 ¶ 27; ECF 40 ¶ 69). She did not complete the cash receipts that day, as she did not see that the permit payments exceeded five-hundred dollars. (ECF 35 ¶ 27; ECF 40 ¶ 96). However, this time, Butler was not present to complete the cash receipts. (ECF 35 ¶ 27).

*H. On January 20, 2021, Jarrell Initiates the Termination Process*

On January 20, 2021, Jarrell drafted a "disciplinary action," which represented the first step of the termination process against Davis. (*Id.* ¶ 31; *see* ECF 24-8 at 16). The disciplinary action listed "termination" as a proposed action. (ECF 24-8 at 16). Jarrell detailed the

7

"infraction" or "incident" as "Insubor[d]ination," "Failure to come to work," "Dishonesty," and "Partnership meetings/cash re[ei]pts/leaving work without approval." (*Id.*). Before drafting the disciplinary action, Jarrell had not considered whether progressive discipline such as a performance improvement plan was warranted in Davis's case. (ECF 40 ¶¶ 74-76).

### *I. On February 8, 2021, Davis Takes FMLA Leave*

In January and February 2021, employees in the ROW department, including Davis, tested positive for COVID-19. (ECF 35 ¶ 34; ECF 40 ¶ 70). Davis sought and obtained FMLA leave from the City from February 8 through February 24, 2021. (ECF 35 ¶ 34; ECF 40 ¶ 71; *see* ECF 24-8 at 14). On February 15, 2021, during Davis's FMLA leave, Jarrell emailed Davis asking for a confirmation that she would return to work on February 22, 2021, to which she replied that her doctor recommended that she return to work later than that date. (ECF 35 ¶ 35; *see* ECF 24-8 at 18). Jarrell responded to Davis on February 22, 2021, asking Davis to estimate what date she would return to work, however Davis did not reply. (ECF 35 ¶ 35; ECF 40 ¶ 72; *see* ECF 24-8 at 18). Davis returned from her FMLA leave on February 25, 2021. (ECF 35 ¶ 36).

### *J. On February 25, 2021, Davis Is Terminated*

When Davis returned to work on February 25, 2021, from her FMLA leave, Jarrell and the City Attorney informed Davis that she was terminated from her employment with the City and gave Davis a "Disciplinary Action" form. (*Id.*; ECF 40 ¶ 73; *see* ECF 24-8 at 15). The reasons listed on the form were (1) insubordination due to a failure to come to work, failure to perform work with cash receipts, and failure to check voicemails, and (2) dishonesty for failure to attend partnership meetings, failure to perform cash receipts, and leaving work without approval. (ECF 40 ¶ 73; *see* ECF 24-8 at 15). On March 24, 2021, the City held a pre-

deprivation hearing (ECF 35 ¶ 37), and Davis's termination became effective on March 26, 2021, the day she was informed of the pre-deprivation hearing officer's decision (*id.* ¶ 38).

## II. STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770; Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne*, 337 F.3d at 770 (citations omitted). The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.

A court must construe the record in the light most favorable to the nonmoving party, and avoid "the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* (citations omitted). "[A] party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771 (citation omitted).

## III. FMLA

### A. Applicable Law

The FMLA establishes two categories of protections for employees who need to take reasonable leave for medical purposes. *See* 29 U.S.C. § 2601(b)(2); *King v. Preferred Tech.*

*Grp.*, 166 F.3d 887, 891 (7th Cir. 1999). First, the FMLA grants eligible employees certain "substantive statutory rights." *King*, 166 F.3d at 891. It "provides eligible employees of a covered employer the right to take unpaid leave for a period of up to twelve work weeks in any twelve-month prior for a serious health condition as defined by the [FMLA]." *Id*. (citing 29 U.S.C. § 2612(a)(1)); *see also Kauffman v. Fed. Express Corp*., 426 F.3d 880, 884 (7th Cir. 2005) (collecting cases). "After the period of qualified leave expires, the employee is entitled to be reinstated to the former position or an equivalent one with the same benefits and terms of employment that existed prior to the exercise of the leave." *King*, 166 F.3d 891 (citing 29 U.S.C. § 2614(a)). "To insure the availability of these guarantees, the FMLA declares it 'unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided.'" *Id*. (quoting 29 U.S.C. § 2615(a)(1)); *see also Kauffman*, 426 F.3d at 884 (collecting cases).

"In addition to these substantive provisions, the FMLA makes it 'unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.'" *Kauffman*, 426 F.3d at 884 (quoting 29 U.S.C. § 2615(a)(2)); *see also King*, 166 F.3d at 891. "Similarly, the Act makes it unlawful for any employer to 'discharge' or 'discriminate' against anyone for taking part in proceedings or inquiries under FMLA." *Kauffman*, 426 F.3d at 884 (citing 29 U.S.C. § 2615(b)). The Seventh Circuit Court of Appeals has "construed these last provisions to create a cause of action for retaliation." *Id*. (collecting cases)

Therefore, a claim under the FMLA for wrongful termination can be brought under either an interference/entitlement or discrimination/retaliation theory. *Id*. The difference is that the discrimination/retaliation type of claim requires proof of discriminatory or retaliatory intent,

while the interference/entitlement type of claim requires only proof that the employer denied the employee her entitlements under the FMLA. *Id.* (collecting cases). Here, Davis maintains her claim for retaliation under the FMLA and "concedes her FMLA interference claim." (ECF 36 at 1 n.2).

### B. Analysis

A plaintiff will succeed on her FMLA retaliation claim if she can demonstrate that she was engaged in an FMLA-protected activity, the employer took an adverse employment action against her, and there was a causal connection between her protected activity and the adverse employment action. *Juday v. FCA US LLC*, 57 F.4th 591, 596 (7th Cir. 2023) (citing *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 220 (7th Cir. 2015)). A retaliation claim can proceed under the direct or indirect methods of proof. *Id.* (citing *Burnett v. LFW Inc.*, 472 F.3d 471, 480 (7th Cir. 2006)). "The direct method of proof permits inferences drawn from circumstantial evidence—the plaintiff can rely on 'a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (citing *Scruggs v. Carrier Corp.*, 688 F.3d 821, 827 (7th Cir. 2012)). In turn, circumstantial evidence includes suspicious timing, evidence that similarly situated employees were treated differently, and evidence that the employer offered a pretextual reason for the discharge. *Larson v. Motor Werks of Barrington, Inc.*, No. 15 C 5572, 2018 WL 287747, at *8 (N.D. Ill. Jan. 4, 2018).

Davis argues her retaliation claim under the direct method of proof. (ECF 36 at 2 ("Davis . . . contends there is circumstantial evidence from which the inference of unlawful FMLA retaliation may be drawn.")). As circumstantial evidence of FMLA retaliation, she points to Jarrell's February 15 and 22, 2021, emails, in which he asks Davis whether she will return from her leave on February 22, 2021, and asks her what her date of return will be. (ECF 36 at 19; *see*

11

ECF 24-8 at 18). She states that Jarrell "was trying to rush Davis to return to work." (ECF 36 at

19). Davis also points to the fact that her termination occurred on the same day as her return

from leave as circumstantial evidence of retaliation. (*Id.*). The parties agree that Davis engaged

in FMLA-protected activity and that the City took adverse action against her. (*Id.*; ECF 39 at 14).

As such, the sole issue for the Court is to determine whether there is a causal connection between

Davis's termination and her protected activity. *See Juday*, 57 F.4th at 596.

Without offering any evidence that the termination was causally connected to her

protective activity, Davis relies on the proverbial suspicious timing theory in arguing that her

termination occurred the day of her return from FMLA leave. However, "suspicious timing alone

rarely is sufficient to overcome a motion for summary judgment." *Curtis*, 807 F.3d at 221. The

plaintiff must still show that the adverse action was illegally motivated by reasons other than

those offered by the employer. *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 629 (7th Cir. 2001).

For example, showing "suspicious timing coupled with suddenly poor performance evaluations

or selective enforcement of work rules is enough to directly establish a *prima facie* case of

retaliation." *Wolotka v. Sch. Town of Munster*, 399 F. Supp. 2d 885, 910 (N.D. Ind. 2005). Here,

Davis only argues that the suspicious timing makes clear that she was retaliated against, in

addition to Jarrell's email asking whether she would return to work. Davis's claim of suspicious

activity cannot, therefore, be sufficient to infer that she was retaliated against.

Additionally, the City's proffered evidence shows that Davis was terminated based on the

alleged pre-FMLA misconduct, not her protected activity. Indeed, "[s]ummary judgment for the

employer is proper where the employer provides undisputed evidence that the adverse

employment action is based upon the employee's misconduct." *Hughes-Rodriguez v. Caravan

Facilities Mgmt., LLC*, No. 1:19-CV-00359-HAB-SLC, 2021 WL 1549738, at *5 (N.D. Ind. Apr.

12

20, 2021) (citing *Curtis*, 807 F.3d at 221). In an attempt to rebut the City's contention that she was terminated for her misconduct, Davis argues that such reason was pretextual. (ECF 36 at 19).

Davis's argument suffers from a fatal blow. That is, the decision to terminate Davis—pretextual or not—occurred *before* the City knew Davis would become sick and take FMLA leave, as demonstrated by the Disciplinary Action form recommending termination dated January 20, 2021, and the email correspondence showing her supervisor was communicating with HR regarding Davis's various issues at work. (ECF 24-8 at 16-17, 22). "Absent knowledge that the FMLA has been previously invoked, there can be no retaliatory intent." *Watkins v. Henderson*, No. IP99-1945-C-B/S, 2001 WL 219807, at *20 (S.D. Ind. Mar. 5, 2001); *see also Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1207-08 (11th Cir. 2001) (stating that there can be no causal link between a request for FMLA leave and termination where the decision-maker had no notice of an FMLA request); *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("A decision maker cannot have been motivated to retaliate by something unknown to him."). Put simply, "[n]o FMLA violation occurs where an employer has already decided to terminate the employee before the employee requests FMLA leave." *Kennebrew v. N.Y.C. Hous. Auth.*, No. 01 CIV 1654 (JSR)(AJP), 2002 WL 265120, at *19-20 (S.D.N.Y. Feb. 26, 2002) (collecting cases); *see Salameh v. Sears Holding Mgmt. Corp.*, No. 08 C 4372, 2010 WL 183361, at *7-8 (N.D. Ill. Jan. 13, 2010) (collecting cases). Davis has not put forth evidence contradicting the existence or date of the disciplinary action nor the communications between Jarrell and HR. Nor has Davis proffered evidence showing that the City had notice of her FMLA leave before Jarrell drafted the disciplinary action. Therefore, Davis is left with no colorable argument that the City retaliated

13

against her for taking FMLA leave, and the Court will grant the City's motion for summary

judgment on the FMLA retaliation claim.

## IV. TITLE VII

### A. Applicable Law

Under Title VII of the Civil Rights Act of 1964, it is unlawful for employers to "fail or

refuse to hire or to discharge any individual, or otherwise to discriminate against any individual

with respect to his compensation, terms, conditions, or privileges of employment, because of

such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). When

deciding a motion for summary judgment for discrimination in violation of Title VII, courts

should ask "whether a reasonable jury could find that the relevant [employment] decision was

motivated in part by an unlawful criterion." *Runkel v. City of Springfield*, 51 F.4th 736, 742 (7th

Cir. 2022) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). Although the

Seventh Circuit has rejected the distinction between direct and indirect evidence and the

corresponding methods of proof of employment discrimination, "one way to make that showing

remains the framework for circumstantial evidence of discrimination adopted by the Supreme

Court in [*McDonnell Douglas Corp. v. Green*]." *Id.; see McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 802 (1973).[6]

Under the well-established *McDonnell Douglas* burden-shifting framework, a plaintiff

must make the following showings to establish a *prima facie* case of Title VII discrimination: (1)

the plaintiff must be a member of a protected class; (2) she must have met the employer's

legitimate expectations or have been qualified for the job in question; (3) she suffered an adverse

---

[6] However, direct evidence continues to be relevant in the analysis. *Runkel*, 51 F.4th at 742 ("[D]istrict courts should consider all available evidence.").

14

employment action; and (4) similarly situated employees who were not members of the plaintiff's protected class were treated more favorably. *Igasaki v. Ill. Dep't of Fin. & Prof. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021); *Taylor v. Canteen Corp.*, 69 F.3d 773, 779 (7th Cir. 1995); *see McDonnell Douglas*, 411 U.S. at 802*; see also Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004). If the plaintiff successfully establishes a *prima facie* case, the burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for the challenged employment action. *Igasaki*, 988 F.3d at 957. Once the defendant has done so, the burden shifts back to the plaintiff to show that the employer's proffered reason is merely a pretext for discrimination. *Id.*

Here, the parties agree that Davis is a member of a protected class because she is black, and that she suffered an adverse employment action as she was terminated. (ECF 24 at 8; ECF 36 at 6). Thus, the two factors at issue in Davis's *prima facie* case are whether she met the City's legitimate expectations and whether similarly situated employees outside of Davis's protected class were treated more favorably than her. (ECF 24 at 8-11; ECF 36 at 6-9). Additionally, whether Davis made a showing that the City's reasons for terminating her were pretextual is also at issue. (ECF 24 at 12; ECF 36 at 9-18).

*B. Whether Davis Was Performing to the City's Legitimate, Nondiscriminatory Expectations*

The City argues that Davis did not meet its legitimate expectations because she (1) failed on three consecutive days to come into work, on time or at all, (2) failed to complete cash receipts, (3) did not inform her supervisor when she would be late to work or leaving work without finishing her tasks, (4) had a large number of unopened voicemails on her desk phone, and (5) admitted to not planning to do cash receipts, in contradiction to many directives issued

by her supervisor. (ECF 24 at 9-10).[7] In response, Davis disputes those allegations and argues that she was meeting the City's expectations. (ECF 36 at 7, 11-12, 15-17).

    1.  <u>Davis did not meet the City's legitimate, nondiscriminatory expectations.</u>

Davis's efforts to show that she met the City's legitimate expectations are unavailing. Casting aside the disputed violations of City policy relating to Davis's alleged issues with tardiness, absences, and failures to communicate and listen to her voicemails, the undisputed facts show that she did not perform the cash receipts on January 19, 2021, when she should have.

The City has established that performing the cash receipts when they exceed five-hundred dollars was an expectation—a legitimate one, considering that this requirement was implemented to comply with state law. (ECF 24-8 at 21; ECF 35 ¶¶ 5, 6, 8, 12). Nothing suggests this expectation was discriminatory, given that it also applied to Butler who was white. This expectation continued throughout the COVID pandemic, during which Davis and Butler were instructed to come into the office two days a week to deposit the cash receipts. (ECF 24-8 at 21; ECF 35 ¶¶ 5, 6, 8, 12). The City also shows—and Davis admits— that she did not perform the cash receipts on January 19, 2021. (ECF 35 ¶ 27; ECF 36 at 16). Davis's only response to this allegation is that she did not perform the cash receipts because permit payments did not exceed five-hundred dollars. (ECF 36 at 16). However, the City submitted evidence showing that the permit payments did exceed that amount on January 14, 2021, and that Davis should have performed the cash receipts on January 19, 2021. (ECF 24-8 at 27).[8] The City's evidence also

---

[7] The February 25, 2021, disciplinary action form, which was given to Davis upon her termination, also lists "partnership meetings" as a justification for her termination. (ECF 24-8 at 15). However, that form does not list Davis's alleged admission that she did not plan on doing the cash receipts. (*Id.*).

[8] The permit payments were received on January 14, 2021 (*id.*), but because of a holiday, the next day the cash receipts were to be deposited was January 19, 2021, Davis's assigned day.

shows that the cash receipts were deposited on January 20, 2021, by Butler, not Davis. (*Id.*). As such, the failure to deposit the cash receipts was a violation of the City's cash receipts policy, and regardless of whether Davis met the City's expectations as to the other cited policy violations, she cannot meet the second prong of the *prima facie* case on this basis.

2. <u>Davis need not show that she met the City's legitimate, nondiscriminatory expectations.</u>

The analysis, however, does not stop here. On one hand, "[w]hen a plaintiff produces evidence sufficient to raise an inference that the employer applied its legitimate expectations in a disparate manner, the second and fourth prongs of *McDonnell Douglas* merge, allowing the plaintiff to establish a prima facie case by establishing that similarly situated employees were treated more favorably." *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 492 (7th Cir. 2014) (brackets in original) (citation and internal quotation marks omitted). On the other hand, a plaintiff "who meets the other criteria for a prima facie case and also demonstrates that the employer's legitimate expectations were themselves pretextual" need not show that she met her employer's legitimate expectations. *Brummett v. Lee Enters., Inc.*, 284 F.3d 742, 745 (7th Cir. 2002). "Under those circumstances, the prima facie case is subsumed into one of establishing pretext." *Id*. Both theories apply in cases in which a plaintiff claims that a disciplinary policy was applied discriminatorily, as is the case here. (ECF 36 at 10-13); *see Curry v. Menard, Inc.*, 270 F.3d 473, 478 (7th Cir. 2001) (merging legitimate expectations prong into pretext analysis when the plaintiff alleged she was disciplined more harshly than employees outside of her protected class); *Jean v. Ind. Dep't of Corr.*, No. 1:19-CV-2005 RLM-DLP, 2021 WL 964287, at *3 (S.D. Ind. Mar. 15, 2021) (merging second and fourth prong of the *prima facie* case when the plaintiff alleged he was disciplined more harshly than employees outside of

his protected class); *Betgavriel v. John Crane, Inc.*, No. 15 C 3649, 2019 WL 13252894, at *4 (N.D. Ill. Mar. 8, 2019).

Here, in addition to arguing that she did meet the City's expectations, Davis states that, even assuming she did engage in the alleged misconduct, the City failed to follow its own progressive disciplinary policy before terminating her. (ECF 36 at 8-13). While she introduces this argument in asserting that the reasons for her termination were pretextual, the Court finds this argument relevant here because it bears on whether Davis needs to carry her burden of showing that she met the City's legitimate, nondiscriminatory expectations. *See Curry*, 270 F.3d at 478; *Felice v. Republic Airlines, Inc.*, 954 F. Supp. 2d 812, 826 (N.D. Ind. 2013) ("[T]he issue of satisfactory performance and the question of pretext overlap because [the employer] asserts as its nondiscriminatory reason for termination that [the plaintiff] was not meeting legitimate job expectations, and therefore the credibility of [the employer's] assertion is at issue for both the second element of [plaintiff's] prima facie case and the pretext analysis."); *see also Scruggs v. Garst Seed Co.,* 587 F.3d 832, 838 (7th Cir. 2009) ("The prima facie case and pretext analyses often overlap."). Therefore, the satisfactory performance prong coalesces into the similarly situated prong and into the pretext analysis. The Court will evaluate whether similarly situated employees who were not in Davis's protected class were disciplined less harshly than Davis for purposes of the fourth factor of the *prima facie* case. The Court will also examine whether the City's alleged reasons for terminating Davis were pretextual—notably, whether the City used the insubordination and dishonesty policies as a pretext for Davis's termination.

*C. Whether Similarly Situated Employees Outside Davis's Protected Class Were Treated More Favorably*

1.  <u>Applicable Law</u>

The fourth factor of the *prima facie* case requires a showing that Davis received less favorable treatment compared to similarly situated employees who are not in her protected class. *Igasaki*, 988 F.3d at 957. To be similarly situated, two employees must have "(1) dealt with the same supervisor, (2) [been] subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (citation and internal quotation marks omitted). "But this is not a hard and fast test, and there is no magic to these considerations. In the employment discrimination context, the requirement to find a similarly situated comparator is really just the same requirement that any case demands—the requirement to submit relevant evidence." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 369 (7th Cir. 2019) (citation and internal quotation marks omitted); *see Coleman*, 667 F.3d at 846 (stating that this standard is "flexible" because the plaintiff's burden to offer a *prima facie* case of discrimination under Title VII is "not onerous"). "Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue." *McDaniel*, 940 F.3d at 369 (citation omitted). It is Davis's burden as the plaintiff to identify an employee and then demonstrate that he or she is similarly situated to her. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 331 n.12 (7th Cir. 2002); *see also Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).

19

2.  The parties' arguments

Davis relies primarily on one instance of disparate treatment. Specifically, she identifies Ankney, a white female, as a similarly situated coworker who was treated more favorably when she was placed on a performance improvement plan ("PIP") to cure the deficiencies in her performance, when Davis was not placed on such plan. (ECF 36 at 8). Davis further points to Jarrell's own testimony that he never considered a PIP to remedy Davis's alleged deficiencies. (*Id.*). She states that Jarrell purposefully classified her alleged conduct as dishonesty and insubordination because a progressive disciplinary policy did not apply to those violations. (*Id.* at 10-13; *see* ECF 18-5). She contends that the alleged misconduct fell under the scope of the City's progressive disciplinary policy, which the City was obligated to implement before terminating her. (ECF 36 at 11-12; *see* ECF 18-5 at 3 (citing examples of misconduct which "<u>shall</u> constitute grounds of disciplinary action on a progressive basis." (emphasis added))). Notably, Davis points to several City policy provisions she thinks should have applied.

She first identifies City Disciplinary Actions policy ("policy") 304(3)(d), which states that "[l]eaving regularly assigned work location without first securing immediate supervisor's permission" is "grounds for disciplinary action on a progressive basis." (ECF 36 at 10). Such violation—as does all the violations under policy 304(3)(d)—is grounds for a "documented verbal warning, written warning, suspension and up to and including discharge . . . ." (*Id.*). Davis next identifies policy 304(3)(g), which applies the progressive policy to "[w]illful carelessness or improper performance of duties." (*Id.* at 11). She further cites policy 304(3)(f), which covers "[f]ailure[s] to observe department work-hour schedule: starting time, quitting time, rest and meal periods" under the progressive policy. (*Id.*). Lastly, she points to policy 304(3)(s), which applies the progressive policy to "[e]xcessive absenteeism for EXEMPT employees (defined as

two or more excused or unexcused absences in a month following a verbal reprimand within a six-month period)." (*Id.*).[9] To bolster her argument, Davis points to the language of the progressive policy which states that any misconduct covered under 304(3) "shall constitute grounds of disciplinary action on a progressive basis." (ECF 36 at 11; *see* ECF 18-5 at 3). In turn, the City admits that the progressive disciplinary policy exists, but argues that Davis's behavior was categorized as insubordination and dishonesty because it was in the City's discretion to make this managerial decision and because it had permissible motives for doing so. (ECF 39 at 11-12; *see* ECF 18-5). The City further contends that Ankney is not a comparator because:

> Ankney's [PIP] was targeted toward her ability to perform detailed aspects of her role (e.g., planning special events, use of geotechnical software, performing neighborhood surveys, managing interaction with printer companies). (ECF 35-2, pp. 21-23 of 29.) Ankney was not placed on a PIP for failing to come into the office at her assigned time. (See id.).

(ECF 40 ¶ 105(a)).

3. There is a genuine issue of material facts regarding whether the City's progressive policy applied to Davis.

As an initial matter, both Davis and Ankney were subject to the same remote work standards, as was Butler, and other employees of the Department. (*See* ECF 24-8 at 21; ECF 40 ¶ 53). The progressive policy was available to all ROW employees who were under Jarrell's supervision, including Ankney and Davis. (*See* ECF 18-5 at 1 ("Supervisors are responsible for enforcing work rules and policies fairly and impartially among *all employees under their direction*." (emphasis added))). Additionally, a review of the record suggests that if an employee's action fell under the scope of the progressive policy, the City was obligated to apply

---

[9] The parties agree that Davis is a salaried exempt employee. (ECF 40 ¶ 47).

its progressive policy. (*Id.* at 3 ("<u>shall</u> constitute grounds of disciplinary action on a progressive

basis" (emphasis added))).[10]

It is undisputed, however, that Ankney and Davis did not engage in the same conduct that

led to their disciplinary action. But the Court is not swayed by the City's attempt to differentiate

Ankney and Davis on that basis, as it does not constitute "differentiating or mitigating

circumstances as would distinguish [Davis's and Butler's] conduct or the employer's treatment

of them." *Coleman*, 667 F.3d at 846, 847 ("So long as the distinctions between the plaintiff and

the proposed comparators are not so significant that they render the comparison effectively

useless, the similarly-situated requirement is satisfied." (citation and internal quotation marks

omitted)). Indeed, if both of their conduct—different as they might be—would have permitted

them to be placed under a PIP or at least a progressive disciplinary action, and if Ankney only

was placed on one, then Davis's termination could indeed result in less favorable treatment. *See*

*id.* at 847 (concluding that the facts that the plaintiff's coworkers reported to different

supervisors and held substantially different jobs than the plaintiff were of "minor differences"

which did not warrant summary judgment). And here, the Court concurs with Davis that the facts

viewed in her favor show that she could have been placed on a PIP or under the City's

progressive policy instead of being terminated, because "the express language of the [City's]

---

[10] It is true the policy gave supervisors latitude "to cover specific circumstances," meaning, "infractions [that] cannot be addressed in this policy." (*Id.* at 1 (emphasis omitted)). However, as will be discussed below, the alleged misconduct fell squarely into the circumstances contemplated by the progressive policy, and thus, a jury could infer that the City violated its own policy by not applying a policy for which an infraction was contemplated. The Court also acknowledges that under the City's disciplinary policy, "[c]orrective action may begin at any step depending on the seriousness of the offense committed," and that the progressive policy contemplated "up to and including discharge." (*Id.* at 1, 3 (emphasis omitted)). However, the City does not argue that it terminated Davis based on a violation of the progressive policy but based on the City's dishonesty and insubordination policies. (ECF 24 at 9 ("Jarrell rightfully determined her actions to be insubordinate," and "Davis's conduct repeatedly indicated to Jarrell that she was being dishonest."); *see id.* at 10, 12; ECF 39 at 11 (referring to the fact that Davis's "behavior leading to termination was classified as insubordination and dishonesty instead of something more lenient.")). Therefore, any argument that the City exercised its discretion to apply the discharge policy is unconvincing.

policy statement indicated that the policy applied to [her]." *Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012); *cf. Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 806 (7th Cir. 2014) (holding that there was not circumstantial evidence of discrimination where plaintiff did not offer any corporate policy that would have applied).

To begin, whether the actions which led Ankney to be placed under a PIP constituted offenses that could have been addressed under the progressive or termination policy remains an issue of material fact. On one hand, the City contends that Ankney had "performance" issues related to "her ability to perform detailed aspects of her role (e.g., planning special events, use of geotechnical software, performing neighborhood surveys, managing interaction with printer companies)." (ECF 40 ¶ 105(a), 113). On the other hand, Davis propounded evidence that Ankney was written up because Jarrell could not otherwise "do this with [Davis.]" (ECF 35-2 at 17-18). Ankney was reprimanded for being late to work, the same reason for which Davis was ultimately terminated. (ECF 35-2 at 16; *see* ECF 39 at 4 ("Jarrell [gave] Ankney a written reprimand for being late to work" (emphasis omitted)). The evidence could, therefore, lead a jury to two conclusions: either, (1) the City placed Ankney under a PIP to address her performance issues *and* her misconduct issues, or (2) Ankney also had tardiness issues (a type of employee misconduct covered under the City's termination policy) but was not terminated for it, unlike Davis. In turn, either conclusion could support the fact that Ankney is a comparator.

Further, the alleged misconduct cited by the City as a basis for Davis's termination appears to be covered under the City's progressive policy. The City's first proffered reason for Davis's termination (that Davis failed on three consecutive days to come into work, on time or at all) could be read as both "[e]xcessive absenteeism for EXEMPT employees (defined as two or more excused or unexcused absences in a month following a verbal reprimand within a six-

month period)" or as "[f]ailure[s] to observe department work-hour schedule: starting time, quitting time, rest and meal periods." (ECF 18-5 at 3-4). Notably, the City cited three alleged unexcused absences from work, two of which occurred after Jarrell wrote Davis that she was "to still come in" the office, and pointed to Davis's failures to arrive at the office by 10am on all three days. (ECF 24-8 at 19; ECF 24 at 8-9).

 The City's second reason (that Davis failed to complete cash receipts), fourth reason (that she had a large number of unopened voicemails on her desk phone), and fifth reason (that she admitted to not planning to do cash receipts, in contradiction to many directives issued by her supervisor) for Davis's termination could also be read as "[w]illful carelessness or improper performance of duties." (ECF 18-5 at 3). Particularly, the City alleges that Davis willfully did not perform the cash receipts on January 12, 14, and 19, 2021. (ECF 24 at 2-3).

Lastly, the City's third proffered reason for terminating Davis (that she did not inform her supervisor when she would be late or leaving without finishing her tasks) falls squarely into policy 304(3)(d) which reads as "[l]eaving regularly assigned work location without first securing immediate supervisor's permission" and "[w]illful carelessness or improper performance of duties." (ECF 18-5 at 3). The City alleges that Davis left on two different occasions without securing approval from Jarrell, and that she left before finishing her tasks, meaning, before performing the cash receipts. (ECF 24 at 8-9).

Based on a reading of the City's disciplinary policies, it is unclear how Jarrell characterized Davis's actions as insubordination, meaning "refusal to perform work," or dishonesty, meaning "deliberate falsification or misrepresentation, misleading or incorrect information in connection with the preparation of City records," as opposed to the acts covered under the progressive policy. (*See* ECF 18-5 at 1-2). That is all the more so, considering the

24

mandatory application of the progressive policy for acts that fall within its ambit. (*See id.* at 3

("The following examples of work misconduct shall constitute grounds of disciplinary action on

a progressive basis."). The City does not shed light on the matter. In fact, it explains that Jarrell

did not even consider the progressive policy to be an option for Davis because she had

"essentially give[n] up her position by not attending or being in the office three days in a row"—

an allegation that is covered by the progressive policy and disputed, as will be discussed below.

(ECF 40 ¶¶ 75-76).

To be sure, the issues of whether the progressive policy applies to Davis's conduct, and

in turn, whether the City violated its own policy in not applying it, are material. This is true, not

only because Ankney would be a comparator to Davis in the similarly situated analysis if the

progressive policy did apply, but also because "an employer's departure from its own

employment policies can constitute circumstantial evidence of discrimination." *Long v. Tchrs.'*

*Ret. Sys. of Ill.*, 585 F.3d 344, 352-53 (7th Cir. 2009) (citing *Rudin v. Lincoln Land Cmty. Coll.*,

420 F.3d 712, 723 (7th Cir. 2005); *Giacoletto v. Amax Zinc Co., Inc.,* 954 F.2d 424, 427 (7th Cir.

1992)).[11]

In essence, Davis has submitted relevant evidence suggesting that (1) Ankney and Davis

were both subject to the progressive policy, (2) the progressive policy was mandatory if the

employee's conduct fell within its purview, (3) Ankney's and Davis's conduct fell under the

policy's purview, and (4) the progressive policy was applied to Ankney but not Davis. In this

---

[11] The Court acknowledges that it is not "a super personnel department that second-guesses employers' business judgments." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 570 (7th Cir. 2017) (citation omitted); *see Hobbs v. City of Chi.*, 573 F.3d 454, 458 (7th Cir. 2009). However, this principle does not stand as a get-out-of-jail-free-card for the City. Indeed, the Court need not "abandon good reason and common sense in assessing an employer's actions." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001). Here, good reason compels the Court to examine the City's decision to apply the dishonesty and insubordination policies as opposed to its progressive policy, as the issue of whether the progressive policy applied is material in this case.

respect, it cannot be said that Davis has presented "no evidence from which a reasonable fact finder could conclude that [she] met [her] burden" of showing that she and Ankney were similarly situated employees. *McDaniel*, 940 F.3d at 369. On the contrary, Davis has provided evidence suggesting that she and Ankney are comparable in "all material respects." *Coleman*, 667 F.3d at 846 ("Similarly situated employees . . . need not be identical in every conceivable way." (citation omitted)).

At the same time, the Court cannot conclude that Ankney is a similarly situated employee that is not a member of Davis's protected class because the material issue of whether the progressive policy was applicable to Davis is disputed. *See Felice*, 954 F. Supp. 2d at 825. In other words, if the progressive policy was not applicable to Davis, then Ankney cannot be a comparator. Because the departure from an employer's own policy can constitute circumstantial evidence of discrimination, and because "sufficient evidence favoring [Davis] exists to permit a jury" to find that that the City may have violated its own policy in terminating her as opposed to placing her under its progressive policy, a genuine issue of material fact exists, such that the Court cannot grant the motion for summary judgment. *Hanners*, 674 F.3d at 691; *Coleman*, 667 F.3d at 858.[12] The Court will nevertheless continue the analysis, assuming Davis can successfully allege that Ankney was similarly situated to Davis and received preferable treatment, as required to make a *prima facie* case under the *McDonnell Douglas* framework.

---

[12] Davis also points to other several instances of disparate treatment: (1) Davis's office area was moved at least four times whereas the white employees' office areas were moved twice only, (2) some of Davis's job duties were taken away, resulting in her demotion and rendering her job description unclear, whereas her non-black coworkers were not subjected to the same conduct, (3) Davis was disciplined for taking her lunches late, but not Butler, a white employee, when she did the same thing, and (4) photos of Davis and not of her non-black coworkers were taken while she was working. (ECF 36 at 9). The City, in response, contends that no other employee has engaged in conduct of comparable seriousness as Davis. (ECF 24 at 10). The Court need not decide whether those facts show that similarly situated employees were treated more favorably than Davis because a disputed issue of material fact exists regarding the application of the progressive policy.

*D. Whether the City's Reasons for Davis's Termination Were Pretextual*

1. <u>Applicable Law</u>

To successfully allege pretext, Davis "would be required to establish that the employer did not honestly believe the reasons it gave for terminating [her]. . . ." *Pitasi v. Gartner Grp., Inc.*, 184 F.3d 709, 718 (7th Cir. 1999) (citation omitted). "In the absence of direct evidence of pretext, [Davis] must come forward with evidence demonstrating that (1) the proffered reason is factually baseless; (2) the proffered reason was not the actual motivation for the adverse employment action; or (3) the proffered reason was insufficient to motivate that adverse employment action." *Lacy v. Ameritech Mobile Commc'ns, Inc.*, 965 F. Supp. 1056, 1070 (N.D. Ill. 1997) (citing *Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996); *Collier v. Budd Co.*, 66 F.3d 886, 892 (7th Cir. 1995)), *aff'd*, 142 F.3d 440 (7th Cir. 1998).

"To establish pretext, [a plaintiff] must identify such weaknesses, implausibilities, inconsistencies, or contradictions in [the defendant's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [the defendant] did not act for the asserted non-discriminatory reasons." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)); *see also Liu v. Cook Cnty.*, 817 F.3d 307, 316 (7th Cir. 2016). "Merely disagreeing with an employer's reasons does not meet this standard." *Tibbs v. Admin. Off. of the Ill. Cts.*, 860 F.3d 502, 506 (7th Cir. 2017); *see also id.* ("Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." (alteration in original) (citation and internal quotation marks omitted)); *Liu*, 817 F.3d at 316.

Davis primarily relies on the City's failure to follow its disciplinary policy as pretext for her termination.[13] She contends that she did not violate the City's insubordination and dishonesty policies and that, even if she did, the City chose a harsher policy over the progressive policy which should have applied in her case. Indeed, "an employer's failure to follow its own internal employment procedures can constitute evidence of pretext." *Rudin*, 420 F.3d at 727 (applying this reasoning in the context of a Title VII retaliation claim); *Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976, 980 (7th Cir. 2000) (concluding the plaintiff had adequately alleged pretext when she "presented evidence that [the employer] had a policy of progressive discipline which would have precluded the firing of [plaintiff] for such trivial offenses without prior warnings which it is conceded she did not receive," and concluding that the application of the progressive policy was an issue of fact "that cannot be resolved on summary judgment"); *but see Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 819-30 (7th Cir. 2006) (concluding that whether a progressive disciplinary mechanism applied was immaterial where the employee handbook provided for discharge for the first offense during first 90 days trial period, during which the progressive policy did not apply).

2. <u>There is a genuine issue of material fact regarding whether Davis violated the City's dishonesty and insubordination policies.</u>

The Court has already evaluated whether the progressive policy could apply in Davis's case and has concluded that an issue of material fact exists on that question. But another issue of material fact exists as to whether Davis violated the City's dishonesty and insubordination

---

[13] Davis also argues that the City's reasons for terminating her were pretextual because (1) Jarrell failed to inform Davis that she could use PTO available to her to address her concern about coming into the office, (2) Jarrell asked Butler to come up with incidents of Davis creating a hostile work environment, and (3) the very reasons given for Davis's termination evidence pretext. (ECF 36 at 9-18). Again, the Court will not evaluate whether those reasons were pretextual, given the existence of disputed issues of material facts.

policies. Indeed, this question is significant for purposes of the pretext analysis because if Davis did not violate the policies for which she was terminated, the City's proffered reasons for her termination may—themselves—be evidence of pretext, as Davis argues. (ECF 36 at 14-18); *Coleman,* 667 F.3d at 855 ("[T]here is inherent 'fishiness' in an employer's proffered reason when it rests on a policy that does not legitimately apply to the employee who was terminated."); *see Felice*, 954 F. Supp. 2d at 824-25 (denying motion for summary judgment where the Court had "identified the disputed issues of material fact which exist concerning whether [plaintiff] actually violated any of these policies as identified by [defendant].").  Here, it is unclear whether Davis violated those policies.

On the final disciplinary form, Jarrell cited "[f]ailure to come to work, failure to perform work with cash receipts[, voicemails]" as instances of insubordination, and "[p]artnership meetings/cash rec[ei]pts/leaving work without approval" as instances of dishonesty, both reasons which are used as a basis for Davis's discharge. (ECF 24-8 at 16).[14]

The City's insubordination and dishonesty policies are set out in policy 304(2). Policy 304(2) states that dishonesty and insubordination are "so serious as to require an employee's immediate discharge." (ECF 36 at 10; *see* ECF 18-5 at 1). The policy describes insubordination as "including, but not limited to, refusal to perform work." (ECF 36 at 10; *see* ECF 18-5 at 2). Dishonesty is described as inclusive of "deliberate falsification or misrepresentation, misleading or incorrect information in connection with the preparation of City records, including an application for employment." (ECF 36 at 10).

---

[14] In the brief now before the Court, the City argues that Davis was insubordinate for substantially the same reasons. Namely, the City argues that Jarrell determined Davis was insubordinate after Davis failed to "arrived on the third consecutive day, and after two explicit directives from Jarrell within the previous week that she must come into the office" to perform her tasks. (ECF 24 at 9).

i.      <u>Insubordination</u>

A reasonable jury could conclude that Davis did not violate the City's insubordination policy. Regarding the contention that Davis did not receive approval before leaving work, the City fails to submit evidence supporting this allegation. Indeed, in his November 20, 2020, email update on COVID-related policies, Jarrell tasked ROW employees to "email [him] when [they] are here and leaving." (ECF 24-8 at 21). The plain language of that email, however, does not suggest that the employees are required to request approval upon departure from work, contrary to the City's argument. The City does not point to another policy or directive requiring ROW employees to request approval before leaving work. Additionally, assuming the policy requires simply that an employee communicate with Jarrell upon arrival and departure from work, the City did not offer evidence showing that Davis *refused* to comply with this directive. Left without any evidence, the Court is faced with Jarrell's word against Davis's.[15]

As to the large number of voicemails left unopened on her desk phone, it appears the City hastily classified this instance as insubordination. The communications between Davis and Jarrell submitted to the Court by the City show that while Davis had issues with accessing her voicemails on her office desk phone, she was still receiving them on her mobile phone, a point she communicated to Jarrell. (ECF 24-8 at 30 ("I have access to voicemails. They are . . . no longer coming to my physical phone.")). Further, the City does not propound any evidence that

---

[15] The City seeks to invalidate Davis's testimony because it is self-serving and because her arguments are based on her "own say-so." (ECF 39 at 8-9, 12). However, "'[s]elf-serving' deposition testimony *may* satisfy a party's evidentiary burden on summary judgment." *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010) (citing *Payne,* 337 F.3d at 772). The sufficiency of a "self-serving" statement depends on whether the statement is based on personal knowledge, observation, or other first-hand personal experience as opposed to mere speculation. *Id.*; *see also Payne*, 337 F.3d at 772. Additionally, the Court takes the facts in the light most favorable to the nonmovant at this procedural posture. As such, the Court will not ignore the portions of Davis's testimony that rely on her personal knowledge.

Davis had 70 unopened voicemails *after* Jarrell pointed out that issue in his January 12, 2021, email and after he directed her to "check the messages on [her] phone." (*Id.* at 19). And assuming that Davis had 70 unopened voicemails on the desk phone, the City does not point to a policy requiring Davis to listen to them on both her personal and desk phones. So while the City's evidence shows that there were two directives given to Davis to listen to her voicemails, the City does not offer evidence that there were two failures to follow the directives. Thus, a reasonable jury could find that Davis was not insubordinate for not listening to the voicemails on her desk phone, as Davis has come forth with an explanation for this issue. In any event, the City seems to have abandoned its position on Davis's failure to listen to her voicemails.[16]

Further, to support the allegation that Davis refused to come to work, the City offered a handwritten note from Jarrell relaying that Davis "[d]idn't come into work Jan[uary] 12th, 14th, [and] 19th[,] 2021." (ECF 24-8 at 19). However, a jury could reasonably conclude otherwise. Davis informed her supervisor that she would not come in at the same time as other coworkers, but she offered to come in during different hours. (ECF 40 ¶ 58). Additionally, Jarrell himself, has admitted that Davis was in the office on January 14, 2023 (*Id.* ¶ 88; ECF 24-8 at 29), suggesting that the City's contention that Davis failed to come in the office three days in a row is a lie or a phony reason for her termination. *See Tibbs*, 860 F.3d at 506; (ECF 24 at 8-9, 12; ECF 24-8 at 16 (citing failure to come to work as reason supporting termination)). A January 15, 2023, email from Butler also states that on January 14, 2021, Butler was in the office when

---

[16] The City does not dispute that Davis was "actively . . . fielding phone calls and checking voicemails through her City-issued phone and her physical phone," that there were not 70 voicemails dating back October 2020 that had not been listened to, that because Davis and Butler had a practice of saving voicemails, the 70 voicemails were "probably saved voicemails," and that Davis had identified a problem with her voicemail system with a City IT employee to look into the issue—though it disputes the materiality of those facts and the implication that "Davis was performing her duties with regard to voicemails in a satisfactory manner." (ECF 40 ¶¶ 97-100).

"[Davis came in . . . talked to two other people in the office before walking towards her desk." (ECF 24-8 at 22). And the City does not have any evidence besides Jarrell's handwritten note to refute Davis's deposition testimony attesting of her presence at the office on January 12 and 19, 2021. Thus, at most, Davis did not come into the office on January 12 and 19, 2021, and even this fact would constitute a matter of dispute. (*Compare* ECF 36 at 15-16, *with* ECF 24 at 1-3).[17]

Tangentially, the City alleges that Davis did not come in the office on time (before 10am) to perform the cash receipts on all three days. (ECF 24 at 8-9). Davis admits that she arrived at the office around midday on each day. (ECF 40 ¶ 69). She maintains, however, that she was not late because the deadline to arrive at the office was "arbitrarily picked," and in any event that the deadline was not enforced. (*Id.* ¶ 92).

The evidence unambiguously shows that the policy as initially stated was to complete the cash receipts by 10am. (ECF 24-8 at 21 ("Deposits to be done . . . in the office before 10 am.")). But Davis has submitted evidence that could lead a factfinder to conclude that the policy may have not been enforced, and thus, that the deadline was arbitrary. Indeed, Jarrell referred to the cash receipt deadline to be "before noon." (ECF 24-8 at 19 ("I have [Butler] in on Monday's and Wednesday's so that you can come in Tuesday's and Thursday's to do the cash receipts before noon.")). Additionally, Jarrell sent an email to the City's HR Department, in which he states that cash receipts were "due before noon every day." (ECF 40 ¶ 59). Davis further testified that it was "very seldom that the cash receipts were done by 10 a.m." and that the 10am deadline was not "practical" because Davis and Butler would have to wait for the mail to arrive, which would not

---

[17] The Court also notes that there is no evidence regarding whether Davis failed to work from home on January 12, 14, and 19, 2021, which puts into question whether she gave up on her position, as the City contends. (ECF 40 ¶ 76; *see id.* ¶ 69). In other words, common sense dictates that if Davis worked from home on all three days—even assuming she failed to come into the office—she could have not given up on her position.

always occur before that deadline. (*Id.* ¶ 92).[18] While the emails Davis points to may be a far cry from constituting "smoking guns," they nevertheless foreclose the City's contention that the policy was unambiguously for Davis and Butler to come in before 10am when seen in conjunction with Davis's testimony.

This leaves the issue of performing cash receipts. Here, again, a jury could reasonably conclude that Davis did not violate the City's insubordination policy when she failed to complete the cash receipts on January 12, 14, and 19, 2021. First, the City does not explain why it was insubordinate for Davis to not perform the cash receipts on January 12, 2021. The City points to Jarrell's email stating that Davis was "to still come in and perform [her] job duties as assigned." (ECF 24-8 at 19). However, the duty to perform cash receipts was assigned to Davis *and* Butler. (*Id.* at 21 (assigning deposits and mail pick-up to Butler and Davis)). Thus, a reasonable jury could conclude that Davis was not insubordinate when she did not perform the cash receipts that her co-worker performed, as they both shared in that responsibility.

---

[18] The City moves to strike and objects to Davis's statement regarding the fact that the deposits were seldom completed by 10am. (ECF 40 ¶ 92). It contends the statement is unfounded and that the cash receipts were "seldom" performed by that time only when Davis performed them. However, a party objecting on the basis of foundation must be specific or apprise the Court "of which of the many possible foundational defects he believed rendered the evidence inadmissible." *United States v. Barker*, 27 F.3d 1287, 1292 (7th Cir. 1994) ("[T]he foundational requirements necessary for the evidence to be properly received will differ depending on the nature of the proposed evidence."). "[A]n objection based merely on 'foundation' is far too general to alert the court to the specific shortcoming that is alleged." *Id.* Here, it is not apparent what the lack of foundation is. It is Davis's job to perform the cash receipts, so she would know through personal experience—or through observation if they were performed by Butler—whether the cash receipts were often performed after 10am. *McKinney v. Chi. Transit Auth.*, No. 20 C 6093, 2022 WL 2257246, at *2 (N.D. Ill. June 23, 2022) ("Employment can provide the foundation for facts and perceptions relating to that employment." (citation omitted)). Davis further provided context for her observation by stating that the mail does not always arrive before the 10a.m. cut-off. *See id.* Lastly, the City's attempt to show that this statement is false by offering evidence that Butler performed cash receipts before 10am in three consecutive days is evidence better suited for a factfinder, which can weigh Davis's testimony against the City's evidence. In any event, "[d]isputes about the admissibility or materiality of evidence must be raised in the parties' briefs." N.D. Ind. L.R. 56-1(f). The City did not raise this issue in its brief, and thus, the motion to strike will be denied summarily. As such, the objection is overruled, and the Court will not strike this portion of Davis's testimony.

Second, as to the City's allegations that Davis was insubordinate in failing to perform the cash receipts on January 14, 2021, the City does offer evidence suggesting that Jarrell directed Davis to do the cash receipts on that day. Indeed, on January 12, 2021, Jarrell assigned Butler to come in on Mondays and Wednesdays, so that Davis "can come in on Tuesday[s] and Thursday[s] to do the cash receipts before noon" and that she "will need to be [in] on Thursday[s] to do these things." (*Id.* at 19). However, a reasonable jury could conclude that Davis was not insubordinate on January 14, 2021, either, because Butler—again, who was equally responsible for the cash receipts—was in the office that day. Additionally, Davis offered evidence showing that Butler instructed Davis to hold-off on depositing the cash receipts because there was a problem, a fact she relayed to Jarrell. (*Id.* at 29-30).[19] The only evidence to the contrary is a January 15, 2021, email from Butler to Jarrell, in which Butler states that Davis relayed she was not "planning on doing [the cash receipts] today," after which Butler claims she responded "it had to be done today it is huge"—an interaction Davis disputes and the credibility of which is better left for a factfinder to assess. (*Id.* at 22); *Payne*, 337 F.3d at 770.

Third, regarding Davis's failure to perform the cash receipts on January 19, 2021, the City, again, does not show that Davis *refused* to do so in spite of a directive. It is undisputed that Davis did not perform the cash receipts on that day, and that the cash receipts exceeded five-hundred dollars. However, the City is asking the Court to infer that Davis's non-performance of

---

[19] The only other communication between Jarrell and Davis concerning cash receipts on January 14, 2021, is a message from Jarrell, stating that the "[c]ash receipt isn't done. . . do you know what the problem is?" (*Id.* at 29). However, this message was sent to Davis after she pointed out that "there was a problem with [Butler's] cash receipt." (*Id.*). Jarrell's response after this exchange casts away any doubt that he "directed" Davis to perform the cash receipts, as he responded "o ok" and "hopefully Atos can fix it." (*Id.* at 29-30).

cash receipts on that day was instead a refusal to exercise her job duties.[20] But this question is better left to a factfinder who can weigh the credibility of Jarrell's and Davis's testimonies.

In sum, based on the evidence of record, it appears there is a material disputed issue as to each instance of alleged violation of the insubordination policy. As such, whether Davis violated the insubordination policy is a matter for the factfinder.

ii.    <u>Dishonesty</u>

The record also does not reflect that Davis was dishonest, meaning that she provided any deliberate false or misleading information, or made any misrepresentation in the preparation of City records. On Davis's disciplinary action form, the City cited "partnership meeting/cash rec[ei]pts/leaving work without approval." (*Id.* at 16).[21] Beyond the failure to perform cash receipts, which the Court has already discussed above, Davis does not deny she failed to attend the 2018 partnership meeting on time nor that she left work without approval on January 12, 14, and 19, 2021. At issue, then, is whether those two failures are violations that result in a disciplinary violation within the meaning of the dishonesty policy. A reasonable jury could conclude that they are not.

The two alleged instances of misconduct—failure to attend a meeting on time and leaving work without approval—are not even close to the act of giving deliberate false or misleading information, or making a misrepresentation in the preparation of City records, as they do not appear to have occurred *during the preparation of City records*. As to the failure to attend the

---

[20] The Court notes that Jarell's directive for Davis to "be [in the office] on Thursday" to perform the cash receipts (ECF 24-8 at 19) does not apply to January 19, 2021, as the latter date fell on a Tuesday.

[21] The City gives a new reason for terminating Davis based on its dishonesty policy in its brief before the Court, which does not appear on the disciplinary action form. It states that Davis was dishonest when Jarrell discovered 70 voicemails on her phone the same day she claimed that she did not receive voicemails. (ECF 24 at 9-10). The Court has already discussed that this material fact is disputed in the context of the insubordination policy and will not re-hash its analysis in the context of the dishonesty policy.

2018 partnership meeting on time, the City does not present any evidence suggesting that Davis's tardiness involved her being dishonest in any way.

Further, as to the allegation that Davis was dishonest when she left work without approval, it is not clear that the City's policy—at least as established in the November 20, 2020, email—requires employees to ask for approval in the first place, as the policy simply states to "email [Jarrell] when [the employees] are here and leaving." (ECF 24-8 at 21). Regardless, there is no evidence suggesting that Davis's alleged failure to obtain approval before leaving work involves any misrepresentation or false or misleading information. On the contrary, the record reflects that Davis informed Jarrell that she was leaving work on at least one day, January 14, 2021. (*Id.* at 29 (stating on January 14, 2021, "I don't feel safe. I'm going home")). The City presents no evidence suggesting that Davis lied about when she arrived or when she left work on January 12 and 19, 2021. Thus, a reasonable jury could conclude that Davis's failure to attend a 2018 partnership meeting on time and that she left work without Jarrell's approval—even if true—were not violations of the City's dishonesty policy.

The City asks the Court to not second-guess the its decision to apply the insubordination and dishonesty policies to Davis's alleged misconduct. (ECF 39 at 10-11). But close scrutiny of the City's decision to terminate Davis based on insubordination and dishonesty reveals that there are genuine issues of material fact as to whether Davis committed those violations in the first place. At best, the evidence casts doubt on whether the alleged violations occurred, in turn casting doubt on whether Davis's acts were so "serious as to require" her immediate discharge. (ECF 18-5 at 1); *see Felice*, 954 F. Supp. 2d at 827 (noting the conduct was not conclusively so "'flagrant, serious or continuous' under [the employer's] progressive discipline policy to result in outright termination").

36

The City's proffered reasons for terminating Davis, contrasted with the undisputed evidence in this case, could suggest to a reasonable jury that its reasons were factually baseless, not the actual motivation for the employment action, or at least insufficient to motivate Davis's termination. *See Lacy*, 965 F. Supp. at 1070. In essence, if Davis did not violate the City's insubordination and dishonesty policies, a reasonable person could find those reasons "unworthy of credence," and thus, infer that the City "did not act for the asserted non-discriminatory reasons." *Boumehdi*, 489 F.3d at 792.[22] And in this case, a factfinder could reasonably believe that Davis did not violate the insubordination and dishonesty policies cited by the City. This too prevents the Court from granting summary judgment on Davis's Title VII claim. *Coleman*, 667 F.3d at 858.

Additionally, and to reiterate, a jury could reasonably believe that Davis should have been placed under the City's progressive policy. This, in turn, could indicate that, not only Ankney was a similarly situated employee who received more favorable treatment than Davis, but that the City's reasons for terminating Davis were pretextual. *Long*, 585 F.3d at 352-53; *Rudin*, 420 F.3d at 727. Even assuming Davis violated the City's dishonesty and insubordination policies, the issue of whether Davis should have been placed under the City's progressive policy is an issue of material fact for the pretext analysis, as was the case in the Court's analysis of the fourth factor of the *prima facie* case. *See Coleman*, 667 F.3d at 858 ("[T]he prima facie case and pretext analyses often overlap." (citation omitted)). As such, the Court cannot determine at this juncture whether the City's proffered reasons for terminating Davis were pretextual, further

---

[22] Regardless, Davis "need not present evidence that race was the sole cause or even a but-for cause of the City's decision [to terminate] her. Race discrimination claims under Title VII simply require that race be a motivating factor in the defendant's challenged employment decision." *Runkel*, 51 F.4th at 743 (citation and internal quotation marks omitted).

evidencing why the Court will not grant the City's motion for summary judgment on Davis's Title VII claim.[23]

### E. Other Evidence of Discrimination

While Davis relies primarily on the indirect method of showing discrimination (ECF 36 at 6-14), she has also proffered other evidence she believes could create an inference of discrimination (*id.* at 5-6). She first identifies the deposition testimony of Ankney, during which Ankney relays Jarrell's statement that he wrote Ankney up for being late at the office because "if [he] didn't do this [he] can't do this with [Davis]" as Ankney "was a young white woman" and as "Davis would pull the race card." (ECF 35-2 at 17-18). According to Ankney, those statements were made during the time she was placed under a PIP (between April 8, 2020, and August 11, 2020). (*Id.* at 20; *see id.* at 19). Davis also points to Ankney's testimony that Jarrell, among others, told Ankney "numerous times" that Davis was "untouchable." (*Id.* at 11).

The City denies that Jarrell made those statements and argues that "Ankney discredited her own recollection a number [of] times saying 'I've slept since then'" and that those statements are not material to whether the City's cause of termination was pretextual. (ECF 40 ¶¶ 113-14). It further seeks to discredit Ankney's statements because she described the event differently in a Charge of Discrimination she filed against the City on February 24, 2021, a document filed under penalty of perjury. (ECF 39 at 5 n.4 (citing ECF 41 at 62 (stating "[I was] told by Jerrell that I had to be given the discipline so a black employee could not allege she was treated differently because of her race."))). The City also argues that those statements were not made in

---

[23] The Court will not evaluate whether the City's reasons for termination were legitimate because there exists an issue of material fact as to whether Davis can make a *prima facie* case of discrimination, the first required step of the *McDonnell Douglas* framework. Additionally, the parties do not dispute that the City's policies were legitimate and nondiscriminatory.

the "specific employment decision in question"—meaning Davis's termination—but that they were made in the context of Ankney's disciplinary response. (ECF 39 at 4-5). Thus, the City argues, this is not the type of direct evidence contemplated by Seventh Circuit jurisprudence. *Id.*

As an initial matter, Jarrell's alleged statements are material to whether the City's reasons for terminating Davis were pretextual. Those statements, if true, could lead a jury to reasonably infer that Davis's race contributed to her termination. But because the statements are disputed, the Court is not able to weigh the evidence as this is a task reserved to the factfinder—especially if it appears Ankney may have discredited her own testimony. *Payne*, 337 F.3d at 770.

Additionally, though the Seventh Circuit continues to recognize direct evidence as relevant to a court's analysis of a Title VII discrimination claim, it has instructed district courts to consider "all available evidence." *Runkel*, 51 F.4th at 742 ("[D]istrict courts should consider all available evidence and, when deciding a motion for summary judgment, should ask whether a reasonable jury could find that the relevant decision was motivated in part by an unlawful criterion." (citation omitted)). Here, the Court finds Ankney's testimony relevant to Davis's claim, and, if true, Jarrell's statements may be indicative that Jarrell held racial animus towards Davis, especially taken together with the possibility that the City may have strayed from its own policy of applying the progressive policy, and that Davis may have not violated the dishonesty and insubordination policies as the City contends. Therefore, the Court will not disregard those allegations simply because they were made in the context of Jarrell disciplining Ankney as opposed to Davis.

"Giving [Davis] the benefit of reasonable inferences from the evidence," a jury could find that the City discriminated against her on the basis of her race, and "the City's evidence does not conclusively foreclose such a finding." *Id.* at 747. Thus, the Court finds that genuine issues

of material fact exists as to whether Davis's race contributed to the City's decision to terminate her, therefore preventing the Court from awarding the City summary judgment.

## V. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the City's motion for summary judgment (ECF 23). The motion is GRANTED as to the FMLA interference and retaliation claims, the ADEA claim, and the Title VII gender discrimination claim, and these claims are DISMISSED. The motion for summary judgment is otherwise DENIED. Davis's claim against the City for race discrimination under Title VII REMAINS as the sole surviving claim in this case. The Court SETS this matter for a scheduling conference on October 18, 2023, at 10:30am.

SO ORDERED.

Entered this 29th day of September 2023.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge

40